Paul BEINTEMA, Appellant (Defendant),

v.

The STATE of Wyoming,
Appellee (Plaintiff).

No. 97–353.

Supreme Court of Wyoming.

Dec. 10, 1998.

Rehearing Denied Jan. 5, 1999.

Tim Newcomb of Grant & Newcomb, Laramie, Wyoming, for Appellant.

William U. Hill, Attorney General; Paul S. Rehurek, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; and Kimberly A. Baker–Musick, Assistant Attorney General, for Appellee.

Before LEHMAN, C.J., and THOMAS, MACY, GOLDEN and TAYLOR,* JJ.

MACY, Justice.

Appellant Paul Beintema appeals from the denial of his motion for a new trial.

We affirm.

## ISSUES

Beintema presents the following issues for our review:

ISSUE I[:] Did the court abuse its discretion when it denied the motion for new trial on the grounds that the State's plea agreement with its key witness should have been discovered earlier?

ISSUE II[:] Did the newly discovered evidence establish a *Brady* violation and, thereby, render improper the court's denial of the motion for new trial?

## FACTS

The case before us is the second appeal ensuing from Beintema's conviction for delivering marihuana. We recounted the salient facts of the underlying offense in our decision on Beintema's initial appeal. *Beintema v. State*, 936 P.2d 1221 (Wyo.1997).

On December 23, 1994, a Gillette police officer responded to a report involving a runaway. During his investigation, the police officer came into contact with a juvenile who possessed approximately fifty grams of marihuana. The juvenile had obtained the marihuana from Darrel Huskinson.

The police obtained a search warrant for the Huskinson home. During the search, the police recovered approximately two ounces of marihuana from the bedroom belonging to Darrel's parents, Brent and Tammy Huskinson. Mr. Huskinson told the police that he and his wife were heavy marihuana users and indicated that they purchased their marihuana from a Colorado man whose first name was Paul and whose last name began with the letter "B". He provided the police with a telephone number for "Paul B."

Further investigation revealed that Appellant was the man who had supplied the marihuana to the Huskinsons. Appellant was arrested and charged with one count of delivery of marihuana, a controlled substance, under WYO. STAT. § 35–7–1031(a)(ii) (Supp.1996). Appellant pleaded not guilty to the charge, and a jury trial was held. The jury returned a guilty verdict. Appellant filed two motions for a new trial, claiming that sufficient evidence did not exist to convict him and that he had not received effective assistance from his trial counsel. The trial court denied Appellant's motions, and he appealed to this Court.

*Id.* at 1223. Beintema presented two issues in his initial appeal: (1) Whether reversal of his conviction was required because the prosecutor referred to Beintema's other bad acts; and (2) whether the trial counsel effectively assisted Beintema. *Id.* This Court affirmed

---

*\* Chief Justice at time of oral argument; retired November 2, 1998*

Beintema's conviction on April 23, 1997. 936 P.2d at 1229. We concluded: "The evidence of [Beintema's] other bad acts was admissible, and [Beintema] received effective assistance of trial counsel." *Id.*

Subsequent to our affirmance of his conviction, Beintema filed a third motion for a new trial. The trial court held an evidentiary hearing on the motion and issued a decision letter and an order denying Beintema's motion. Beintema perfected his appeal to the Wyoming Supreme Court.

## DISCUSSION

### A. Newly Discovered Evidence

Beintema contends that the trial court abused its discretion when it denied his motion for a new trial. He claims that he was entitled to have a new trial because he discovered new evidence after his trial. We do not agree with Beintema and conclude that the trial court properly denied his motion.

■■■ A trial court has discretion in determining whether to grant or deny a defendant's motion for a new trial. *Taul v. State,* 862 P.2d 649, 659 (Wyo.1993). In determining whether the trial court abused its discretion, we must decide the ultimate issue of whether the court could have reasonably concluded as it did. *Capshaw v. State,* 958 P.2d 387, 390 (Wyo.1998). Unless the trial court acted in a manner that exceeded the bounds of reason under the circumstances, it did not abuse its discretion. *Hilterbrand v. State,* 930 P.2d 1248, 1250 (Wyo.1997). In the absence of an abuse of discretion, we will not disturb the trial court's determination. *Taul,* 862 P.2d at 659.

■■ A defendant must establish four factors in order to obtain a new trial on the basis of newly discovered evidence: (1) the defendant did not become aware of the new evidence until after the trial; (2) it was not because of a lack of due diligence that the new evidence did not come to light sooner; (3) the evidence is so material that it would probably produce a different verdict; and (4) the evidence is not cumulative. *Barnes v. State,* 858 P.2d 522, 536 (Wyo.1993); *Opie v. State,* 422 P.2d 84, 85 (Wyo.1967).

In this case, Beintema identifies several pieces of evidence that he contends are newly discovered: (1) the prosecution and Brent Huskinson, the key witness at Beintema's trial, entered into a plea agreement in which the prosecution agreed to recommend that Huskinson be placed on probation, and the prosecution did not reveal to Beintema that the agreement existed or that Huskinson was on probation; (2) the prosecutor misled the jury regarding the existence of the plea agreement; (3) Steve Rozier, a sergeant with the Gillette police department, promised Huskinson that, if he cooperated with the prosecution, "nothing would happen" to his wife or children. Beintema claims that a reasonable probability exists that, if this evidence had been disclosed to him prior to his trial, the verdict would have been different.

Beintema's trial attorney asked the prosecutor for information concerning any plea agreement that the prosecution may have negotiated with Huskinson, and the prosecutor declared that a plea agreement did not exist. Contrary to the prosecutor's declaration, the prosecution and Huskinson had entered into a plea agreement. The particulars of the plea agreement were disclosed in the transcript from Huskinson's arraignment hearing:

THE COURT: Are there any plea negotiations or agreements that need to be placed of record before the court proceeds?

[THE PROSECUTOR]: Your Honor, the only agreement that the parties have at this point is that Mr. Huskinson pleads guilty [to a charge of possession with intent to deliver marijuana] today, that it's my understanding his criminal history is nonexistent in terms of prior felony convictions or significant misdemeanor convictions, and that given that the state will recommend probation be imposed by this court at the time of sentencing.

Although the prosecutor represented that a plea agreement did not exist between Huskinson and the prosecution, Beintema's trial attorney discovered the agreement prior to Beintema's trial. The attorney testified at the hearing on Beintema's motion for a new trial that, in preparing for Beintema's trial, he had taken it upon himself to examine the

transcript from Huskinson's arraignment hearing. The trial attorney stated, however, that he did not perceive the agreement as being a "deal."

In his opening statement at Beintema's trial, the prosecutor told the jury: "Huskinson comes before you today having not cut a plea agreement, having not entered any sort of plea bargain for having promised to come and testify before you today." At the hearing on Beintema's motion for a new trial, the prosecutor explained that he considered his opening statement at the trial to be accurate and that he intended to tell the jury that Huskinson "was coming before the [c]ourt having not previously agreed to disclose his [drugs] source."

The prosecutor also elicited the following testimony from Huskinson at Beintema's trial:

Q Prior to your plea of guilty or prior to even today, did you enter into any sort of agreement with the county attorney's office or members of the Gillette police department where you agreed to identify your source and assist in the prosecution?

A A deal? No.

At the hearing on Beintema's motion for a new trial, Huskinson acknowledged that he had entered into the plea agreement. Throughout the hearing, however, Huskinson maintained that his trial testimony was consistent with the statements that he was making at the hearing.

Beintema argues vehemently that we should not apply the four-factor analysis set out in *Barnes* and *Opie* because the prosecutor and Huskinson both made false representations to the jury about the existence of a plea agreement. He relies on *United States v. Johnson,* 142 F.2d 588 (7th Cir.), *cert. dismissed,* 323 U.S. 806, 65 S.Ct. 264, 265, 89 L.Ed. 643 (1944), to support his contention. The trial court observed, in its decision letter, that, although the prosecutor's opening statement was technically incorrect, the prosecutor did not intentionally misrepresent the facts.

We have carefully reviewed the record in this case, and we agree with the trial court. Any misstatements that the prosecutor and/or Huskinson made were inadvertent and resulted from unartful expressions or misunderstandings of the questions. Furthermore, Beintema's trial attorney could have objected to the prosecutor's statements or questioned Huskinson about his plea agreement if he thought that the jury needed to know this information. We conclude, therefore, that the traditional four-factor analysis is appropriate in this case and that we do not need to determine whether *Johnson* requires us to abandon the four-factor test when false representations are made to a jury.

■ In denying Beintema's motion for a new trial, the trial court found in pertinent part:

The argument for a new trial is based largely on [Beintema's] allegations of newly discovered evidence. The argument fails because the facts do not support it. It was clear from [Beintema's trial attorney's] testimony at the September 11, 1997[,] hearing that he was aware of the "Huskinson deal," such as it was, well before the Beintema trial. As you recall[, Beintema's trial attorney] testified that he read the transcript of the hearing wherein Huskinson's "deal" was announced and his guilty plea [was] entered and accepted by Judge Price. I found the testimony to be completely believable; moreover, the court files are entirely consistent with his testimony.

We agree with the trial court's analysis. Huskinson's plea agreement with the prosecution was not newly discovered evidence because the trial attorney knew about the plea agreement prior to Beintema's trial. Beintema was not, therefore, entitled to be granted a new trial on the basis of the plea agreement or the prosecutor's and Huskinson's statements regarding the plea agreement.

■ We turn now to Beintema's contention that he is entitled to have a new trial because he discovered after his trial that Officer Rozier had, in effect, threatened Huskinson by promising him that, if he cooperated with the prosecution, nothing would happen to his wife or his children. Beintema claims that he could have used this evidence

at his trial to challenge Huskinson's credibility.

Huskinson testified at the hearing on Beintema's motion for a new trial about Officer Rozier's alleged threats. He disclosed the discussions he had with Officer Rozier while the police were searching his home:

Q Okay. While [Officer Rozier] was there he said some things to you about what the future might hold for you, true?

A Yes.

Q What did he say?

A I can't remember everything, but the things that stick out in my mind [are] that as long as I cooperated—which I acted like I was going to at first; I just wanted him out of my house—but he said as long as you cooperate, no harm will come for you or your kids and that I could avoid—I could save my job and avoid jail and everything else, as long as I was willing to cooperate.

Q Did he give some idea what cooperating meant?

A He wanted me to set [Beintema] up.

Q By set him up, you mean?

A Have—make a deal and have him come to my house and [Officer Rozier] would be there ready to get him.

Huskinson also testified about a conversation he had with Officer Rozier prior to Beintema's preliminary hearing:

Q All right. Was there anything that Mr. Rozier said to you regarding your wife?

A Not at that time he didn't, not too much, other than he wanted to charge her, too, you know, but he kind of—he kind of got, I guess, not worried about her, because they had me, they didn't need to prosecute her, but later on when I had to testify for the first time, he said he would charge the same charges against her if I didn't cooperate.

Q Let's talk about that. Was that after the formal charges were filed against you?

A Yes.

Q Okay. And at the time of the preliminary hearing in Paul Beintema's case?

A Yes.

Q All right. Tell us about that. What happened there?

A That was when most [of] the threats c[a]me out, because I was going to—I wasn't going to say anything, and the Judge basically told me, you'll go to jail until you decide you are going to say something. But before the [preliminary hearing] started, [Officer Rozier] came in and sat down.

. . . .

Q Go ahead.

A Well, he c[a]me in, because he thought I wasn't going to testify, and he told me how foolish I was and that I was just—you know, my life was getting in order then; that if I may not testify, I was going to be throwing everything away.

Q Did he say anything about your wife?

A That was the time he said we will prosecute your wife with possession with intent also if you don't cooperate.

Q Don't cooperate by doing what?

A By testifying against [Beintema].

. . . .

Q Now, was that at the time of Paul Beintema's preliminary hearing?

A Yes.

. . . .

Q Was it your understanding after that conversation with Mr. Rozier that if you did testify against Paul Beintema, your wife would not be charged?

A That's correct.

. . . .

Q Did Mr. Rozier ever discuss the subject of your children with you?

A Not at that time. It was—it wasn't direct, you know, we're going to take your kids or anything like that. He just said, ["]Nothing is going to happen to you or your kids if you cooperate.["] That was his words.

We are convinced that, even if Beintema had been informed at the time of his trial about Officer Rozier's threats against Huskinson, the information would not have had

much impact as impeachment evidence because Beintema's attorney elicited similar testimony during the trial from Huskinson. Huskinson testified that Officer Rozier told him that, if he cooperated, he could possibly save his job but that, if he did not cooperate, Officer Rozier was going to make life "real miserable" for him. The jury was, consequently, aware that Huskinson was under some compulsion to cooperate with the authorities. The jury had further reason to suspect Huskinson's credibility because Huskinson testified that he had spent only a short time in jail as a result of his role in the marihuana delivery. Beintema's attorney also argued to the jury that Huskinson may have been trying to protect his family when he identified Beintema as being his drug source and testified against him.

Taking all the evidence presented at Beintema's trial into consideration, we conclude that, even if the evidence of Officer Rozier's threats were presented to the jury, it probably would not produce a different verdict. Furthermore, the evidence of Officer Rozier's threats was cumulative to the other evidence that Beintema's attorney used in his attempt to challenge Huskinson's credibility. The trial court, therefore, did not abuse its discretion by denying Beintema's motion for a new trial.

## B. *Brady* Violations

Beintema maintains that the prosecution violated the directives of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and its progeny when it did not disclose valuable impeachment evidence to him. He contends that he is, therefore, entitled to have a new trial. We disagree.

█ The United States Supreme Court has ruled that the prosecution is required to disclose evidence to the defense that is favorable to the accused and material to either the defendant's guilt or his punishment. *Brady,* 373 U.S. at 87, 83 S.Ct. 1194; *United States v. Bagley,* 473 U.S. 667, 674, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985); *see also Kerns v. State,* 920 P.2d 632, 637 (Wyo.1996). This rule is "intended to protect a defendant's right to a fair trial under the due process clause of the Constitution of the United States." *Rodriguez v. State,* 962 P.2d 141, 145 (Wyo.1998). *See also Brady,* 373 U.S. at 86–87, 83 S.Ct. 1194. The prosecution has an affirmative duty to disclose impeachment and exculpatory evidence, and the defense is not required to specifically request such evidence in order to prompt the prosecution's disclosure duty. *Kerns,* 920 P.2d at 637; *Bagley,* 473 U.S. at 674, 105 S.Ct. 3375. If the prosecution does not disclose evidence that is favorable to the accused and such evidence is material, a reversal of the defendant's conviction is required. *Kerns,* 920 P.2d at 637. "[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Bagley,* 473 U.S. at 682, 105 S.Ct. 3375. *See also Kerns,* 920 P.2d at 637–38.

█ Beintema contends that he is entitled to have a new trial because the prosecutor improperly suppressed Huskinson's plea agreement with the prosecution and Officer Rozier's threats against Huskinson. Beintema claims that this evidence would have been valuable to him in challenging Huskinson's credibility. We do not need to determine whether the prosecution improperly suppressed the evidence in this case because Beintema has not shown that the evidence was material to his guilt or punishment. Beintema's attorney knew prior to Beintema's trial that the prosecution and Huskinson had entered into a formal plea agreement. The fact that the evidence became available to Beintema from his attorney rather than from the prosecution is irrelevant to our analysis of the materiality of the evidence. Regardless of the source of the evidence, it was available to Beintema for use in his defense.

Beintema's attorney did not choose to point out to the jury that the plea agreement existed. The fact that Beintema did not use the plea agreement evidence seems to be an acknowledgment on his part that the evidence was not material to his guilt or punishment. *See Rodriguez,* 962 P.2d at 146–47. Accordingly, the prosecution's failure to disclose the evidence to Beintema does not un-

dermine our confidence in the guilty verdict against Beintema.

██ Beintema also asserts that the prosecution's failure to disclose the evidence of Officer Rozier's threats against Huskinson justified granting him a new trial under the rule set out in *Brady*, 373 U.S. at 87, 83 S.Ct. 1194. As we explained earlier in this opinion, the evidence of Officer Rozier's threats was cumulative to other evidence that Beintema used in challenging Huskinson's credibility. Consequently, even if the evidence of Officer Rozier's threats against Huskinson had been disclosed to the defense, there is no reasonable probability that the result of Beintema's trial would have been different. The trial court did not err by refusing to grant a new trial.

As a final note to this decision, we emphasize that we have decided this case on the basis of its unique facts. We do not mean to suggest that we, in any way, condone prosecutors suppressing evidence. The practicing bar may rest assured that the *Brady* rule is alive and well in Wyoming and that this Court will enforce it in proper cases.

Affirmed.

GOLDEN, Justice, dissenting, with whom LEHMAN, Chief Justice, joins.

After careful consideration, I have concluded that Beintema's trial was not fundamentally fair. I, therefore, respectfully dissent.

The facts of this case are that the prosecutor and Huskinson, the primary testifying witness against Beintema, falsely told the jury that there was no plea agreement for that testimony when, in fact, investigating officers and the district attorney had promised Huskinson that his family would not be prosecuted, and he would receive a probation recommendation in exchange for his testimony against Beintema. We know that the statements are false because the prosecutor testified in the post-trial hearing that there had been a plea agreement as defined in Wyo. R.Crim. P. 11(e), and Huskinson, while denying it was a "deal," nevertheless described a plea agreement. His description of the "deal" caused the judge presiding at the post-trial hearing to interrupt Huskinson's

testimony, advise him of his Fifth Amendment rights, and warn that perjury charges could result from continued testimony. At that same post-trial hearing, the prosecutor testified that he did not disclose Huskinson's plea agreement to Beintema's trial defense counsel during a face-to-face conversation occurring before trial and despite defense requests for such information. The transcript from Huskinson's change of plea hearing reveals that the prosecutor only informed Beintema's trial defense counsel that there was a probation recommendation, but did not inform him that the probation recommendation was in exchange for testimony against Beintema. That transcript reveals that the prosecutor also did not inform the court of that condition as is required of the prosecution.

This deception produced the desired result when, at trial, Beintema's defense counsel did not challenge the prosecutor or Huskinson when both falsely told a jury that there had been no plea agreement and did not raise the plea agreement issue during his cross-examination of Huskinson. It further produced the desired result of a conviction in a weak case for charges based solely upon the testimony of a witness who the jury did not know had a possible interest in testifying falsely against Beintema in order to protect his family and his liberty. Any suspicion the jury may have had regarding Huskinson's bias was effectively allayed by the prosecutor's false statement to them. The question before us is whether the prosecutor's conduct in making a false statement to the jury and in allowing his primary witness to make a false statement to the jury requires a new trial regardless of the conduct of defense counsel.

It is well-established constitutional law that when a prosecutor makes false statements or knowingly allows a witness to make false statements, a due process violation has occurred, a fair trial has been denied if the jury's judgment was affected, and the defendant is entitled to a new trial. *Giglio v. United States*, 405 U.S. 150, 153–54, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972); *Napue v. Illinois*, 360 U.S. 264, 269–72, 79 S.Ct. 1173, 1177–78, 3 L.Ed.2d 1217 (1959). Both *Giglio*

and *Napue* involved plea agreements, and their holdings were reached even though the false testimony went only to the credibility of the witness. Because the prosecution deliberately failed to disclose that the probation recommendation was in exchange for testimony against Beintema, defense counsel had no due diligence duty to make further inquiry, and because the connection was not discovered until after trial and is, therefore, newly discovered evidence, the answer to the question before us is, yes, there must be a new trial. I must, therefore, respectfully dissent.